IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALLISON SCHLOSS,<br><br>   Plaintiff,<br><br>v.<br><br>CITY OF CHICAGO, a municipal corporation,<br><br>   Defendant. | Case No.: 18-cv-<br><br><br><br><br><br>**JURY DEMAND** |

# COMPLAINT

Plaintiff Allison Schloss alleges the following against Defendant, the City of Chicago (the "City" or "Defendant"):

## I. NATURE OF THE CLAIM

1. This is an action brought to remedy discrimination in employment on the basis of sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq.*, and the Illinois Civil Rights Act, 740 ILCS 23/5(a)(1), and for the intentional infliction of emotional distress. Plaintiff seeks declaratory and injunctive relief and other equitable make-whole relief both to secure future protection and to redress the past deprivation of the rights secured to her under federal and state law.

2. Plaintiff is a female sworn officer of the Chicago Police Department ("CPD"), who has held the rank of lieutenant for the past 16 years. In May 2014, she was promoted by former Superintendent Garry McCarthy and served as the first

421143-11

(and only) female commanding officer of the Marine and Helicopter Unit until May 2016, when she was removed from her command—because of her sex.

3. While in command of the Marine and Helicopter Unit, Plaintiff was targeted for harassment and discrimination by Steve E. Georgas, the acting deputy chief and later deputy chief of CPD's Special Functions Division. The Special Functions Division includes the Marine and Helicopter Unit, the Bomb Squad, the Special Weapons and Tactics (SWAT) Team, and other high-profile operations from which women have been—and continue to be—largely excluded from employment.

4. The number of women employed in CPD's Special Functions Division during Deputy Chief Georgas' command was abominable—and it remains so today. Based upon data available in March 2016, just before Georgas removed Plaintiff from her command:

> A. 0 of 15 members (0%) of the Bomb Squad (title code 9158, D3 pay) were women;
>
> B. 0 of 66 members (0%) of the SWAT team, a prestigious position with training opportunities and extensive overtime, were women;
>
> C. at most 1 of 25 (4%) Marine Unit officers (title code 9168, D2 pay) was a woman, and she was detailed out to another unit. (Plaintiff did have one other female Marine Unit officer in training and another female officer, in a different title code, working as her Marine Unit secretary);

D. 0 of 5 (0%) Helicopter Unit officers (title code 9154) were women. (The officer working as Plaintiff's Helicopter Unit secretary, in a different title code, was a woman);

E. 4 of 42 (9.5%) explosives detection canine handlers (title code 9153, D2 pay) were women;

F. 3 of 21 (14%) Mounted Unit officers (title code 9169, D2 pay) were women.

5. Deputy Chief Georgas permitted, modeled, and fueled gender-based resistance to Plaintiff's command by her male subordinate officers. He scapegoated her, harassed her, humiliated her, and intentionally undermined her command.

6. On May 31, 2016, Georges terminated Plaintiff's command of the Marine Unit, because of her sex. On June 8, 2016, he terminated her command of the Helicopter Unit, because of her sex and in retaliation for an internal sex discrimination complaint that she filed on June 7. In addition to other relief, Plaintiff has filed this action to secure reinstatement to her command of the Marine and Helicopter Unit, which currently has no permanent commanding officer.

7. Georgas no longer serves as deputy chief of the Special Functions Division. He was assigned to Detached Services effective September 1, 2016.

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction over Plaintiff's federal claims pursuant to 42 U.S.C. § 2000e-5(f)(3) (Title VII) and 28 U.S.C. §§ 1331 (federal question) and 1443 (civil rights).

9. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 42 U.S.C. § 1367.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims alleged occurred in this District.

### III. PARTIES

#### A. Plaintiff

11. Plaintiff Allison Schloss is a female CPD lieutenant.

12. Plaintiff has met all administrative prerequisites to the filing of this lawsuit under Title VII. On October 11, 2016, she filed a charge of sex discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). She has filed this complaint within 90 days of her receipt of notice of her right to sue from the EEOC.

#### B. Defendant

13. The City is and was at all times relevant a municipal corporation organized and existing under the laws of Illinois.

14. The City is and was at all times relevant Plaintiff's "employer" as defined by Title VII.

### V. FACTUAL ALLEGATIONS

15. Plaintiff has been a sworn CPD officer for 28 years, since March 1990. During her career at CPD, she has been promoted up the ranks twice, first to sergeant, in April 1996, and later to lieutenant, in March 2002. She is currently the commanding officer of CPD's Major Accident Investigations Unit.

16. Plaintiff is also a federal special agent for the United States Coast Guard Reserve, Coast Guard Investigative Service. She has been a member of the Coast Guard since January 2001. She has received many medals, awards, and commendations from the Coast Guard Reserve, including letters of commendation from the special agent-in-charge of the Coast Guard Investigative Service and the president of the Marine Navigation and Training Association.

17. The Chicago Police Department operates a number of specialized, high profile, and prestigious units, including the Bomb Squad, SWAT Team, Explosives Detection, Canine Unit, Helicopter and Marine Unit, and Mounted Police. These units fall within CPD's Special Functions Division.

18. Each Special Functions Division unit has a commanding officer who reports to the deputy chief of the division.

19. From July 2012 until on or around September 1, 2016, Deputy Chief Steve E. Georgas was in charge of all Special Functions Division units.

20. The City has historically excluded women from employment in the Special Functions Division, especially in its most high profile and prestigious units. This pattern was perpetuated during Georgas' tenure as deputy chief. He selected no female commanders to any unit under his command. During his tenure, the SWAT Team and Bomb Squad had zero (0) female officers. The Marine and Helicopter Units had at most one female officer (not counting Plaintiff, the commanding officer, placed there by Superintendent McCarthy) and two female

5

secretaries. As of March 2016, only 4 of 42 (9.5%) of the explosives detection canine handlers were women, and only 3 of 21 (14%) mounted unit officers were women.

21. Both historically and today, the only Special Functions Division unit with a significant presence of female officers is Special Activities, which provides crisis intervention, outreach to families of fallen officers, school visitation, and other stereotypically "female" support functions. These positions are not promotional or prestigious and do not offer a pay increase or title code change.

22. In May 2014, despite the historic obstacles faced by women applying to Special Functions units, Superintendent Garry McCarthy promoted Plaintiff to commanding officer of the Marine and Helicopter Unit.

23. Steve Georgas, then acting deputy chief of the Special Functions Division, had no role in Plaintiff's promotion.

24. As commanding officer of the Marine and Helicopter Unit, Plaintiff was in charge of the policing of all bodies of water within the city of Chicago and all CPD helicopter operations. She reported at all times to Georgas.

25. Plaintiff was the first—and has been the only—female commanding officer of the Marine and Helicopter Unit.

26. Georgas resented and bridled at Plaintiff's command of one of his units. He did not place her there, and he did not want a woman in the post.

27. For the duration of her command, Georgas targeted Plaintiff for harassment and discriminated against her on the basis of her sex.

28. Some, but not all, of the harassment and discrimination took the form of scapegoating: blaming Plaintiff for real or perceived problems that were not within the scope of her responsibilities, to create a pretext for unwarranted discipline and to tarnish her record.

29. Repeatedly, Georgas directed Plaintiff to write reports explaining alleged faults or problems, even if she bore no responsibility for the incident. Then, after she submitted her report, he would claim that he misplaced it, or did not receive it, and require her to re-write it. On numerous occasions, he demanded that she write a report on why a report was missing. This conduct disrupted her from carrying out her duties as commanding officer. Georgas targeted Plaintiff for this harassment because of her sex.

30. Georgas frequently demanded that Plaintiff explain, justify, or rectify circumstances that she did not, and could not, control. His conduct was a manifestation of his hostility to Plaintiff, as a woman, in a position of command.

31. For example, on May 4, 2016, the unit received notification that the City was behind on payments to the company that repairs and maintains CPD helicopters. As commander of the Helicopter Unit, Plaintiff had no control over those payments; and unlike Georgas, a deputy chief, she had neither the job title nor the clout to pressure CPD Financial Operations to make the late payments. Nevertheless, Georgas demanded that she write a "plan" on how to "rectify the issue" and send it to Captain Mark Marianovich by the end of the day. The order was patronizing, insolent, and a useless expenditure of Plaintiff's time. Georgas did

7

not require male commanding officers of his units to expend command time writing memos with "plans" to "rectify" problems they could not repair.

33. In addition to targeting Plaintiff for harassment, Georgas repeatedly denied her approval to attend training, while routinely approving such training requests from male officers. For example, on July 1, 2015, she submitted a request to attend a free four-day Search Coordination and Execution course offered by the U.S. Coast Guard. The training was designed for on-scene coordinators in search and rescue operations, highly relevant to Plaintiff's work and responsibilities as commanding officer of CPD marine operations. Georgas denied approval for Plaintiff to attend this course, on the (alleged) basis that it was during boating season. However, the course was scheduled after the end of all major boating season events. In fact, Georgas denied Plaintiff the training opportunity because of her sex.

33. Similarly, in January 2016, Georgas denied Plaintiff's request for approval to attend a regional safety seminar conference for helicopter unit managers on the proper use of equipment and air patrol policies. Again, he denied her a valuable training opportunity because of her sex.

34. In addition, Georgas routinely countermanded Plaintiff's orders, intentionally undermining her authority with subordinate officers. In contrast, he did not countermand the orders of his male unit commanders or engage in conduct that undermined their authority with subordinate officers. Georgas intentionally undermined Plaintiff's standing with her male subordinates, because of her sex.

8

35. For example, in January 2016, one of Plaintiff's male subordinate officers made a request to take 13 days off. However, the days he requested were not during his assigned vacation time; and the number of days he was requesting was in excess of CPD policy. Plaintiff therefore denied the request, to follow CPD policy and to avoid an officer shortage.

36. Georgas not only overruled Plaintiff's decision—he instructed her to personally notify the subordinate officer that the time was being approved. Although she was unable to provide immediate notice, because the officer had left early for the weekend, she left the approval notice in his mailbox and then met with him early the following week to confirm that his time off was now approved.

37. Subsequently, Georgas disciplined Plaintiff for not notifying the absent officer sooner.

38. Georgas targeted Plaintiff for that discipline because of her sex. He did not discipline male commanders on trumped-up charges, countermand their legitimate orders, or attempt to humiliate them in front of subordinates.

39. On January 15, 2016, Plaintiff began an authorized leave, and a male lieutenant temporarily assumed her responsibilities in her absence. On January 25, all units were required to send officers to Taser training. Since Plaintiff was on leave, it was the responsibility of the lieutenant in command to send officers to training, which he failed to do. However, when Plaintiff returned from leave, she ensured that all of her officers completed Taser training.

40. Shortly thereafter, and consistent with his pattern of harassment and discrimination against Plaintiff, Georgas oversaw the issuance of formal discipline against her, both for the male lieutenant's failure to send officers to Taser training during her authorized leave and also for not immediately notifying the absent male officer that his time off request was approved.

41. In April 2016, Plaintiff received a confidential personnel report from human resources on a Marine Unit officer, which required a response from her. She sent a copy of her confidential memo to Deputy Chief Georgas' secretary via both department mail (in hard copy) and email. She then locked the hard copy of the file in her office drawer, to ensure its confidentiality while she was away from the office on a short military leave. Locking up this material was consistent with CPD procedures for the handling of sensitive personnel information.

42. When she returned from military leave, Georgas instructed Captain Marianovich to issue a Summary Punishment Action Report ("SPAR") against her, for locking the confidential documents in her office drawer. The SPAR alleged that, by locking up the report, she had prevented someone who needed it from accessing it while she was away. The allegation was spurious. When he issued the SPAR, Captain Marianovich acknowledged as much and recommended that Plaintiff request a hearing on it. She did so immediately.

43. Georgas' scapegoating reached its pinnacle in May 2016. On May 9, 2016, Plaintiff presented Captain Marianovich with her projections for the number of officers needed in the Marine and Helicopter Unit to adequately staff the 2016

10

boating season, including heavy boating holidays (Memorial Day Weekend, July 4th, and Labor Day Weekend). The spreadsheet reflected that the unit did not have a sufficient number of trained officers in the event of an emergency, which she and Marianovich also discussed. Plaintiff received no direction on how to deal with the projected manpower shortage and was provided with no additional resources. Moreover, she was under orders not to allow officers in her unit to work overtime.

44. On May 20, 2016, she sent an email to Marianovich, requesting extra officers over Memorial Day Weekend and proposing a plan for the staff schedule, which included deploying each of the two CPD helicopters. Again, she received no response. Without approval from her commanding officer, Plaintiff did not have the authority to staff and deploy both helicopters or to permit officers to work overtime.

45. On Friday evening of Memorial Day Weekend (May 27), Georgas suddenly demanded that the unit have both helicopters running all weekend. Despite the delay in the order, Plaintiff was able to deploy both helicopters all weekend. The manpower in the unit was still insufficient, however, as Plaintiff had notified Marianovich it would be.

46. Plaintiff was not scheduled to be on duty over the weekend. One crew with four marine officers and one sergeant were on duty each shift.

47. On Sunday afternoon, a boater was reported missing on Lake Michigan. Plaintiff was not on duty at the time, because it was not her shift. However, when the report came in, she responded immediately to the unit and took charge of the search. Despite extraordinary efforts to rescue the boater, he drowned.

11

48. Although it was not Georgas' practice to report to such calls, he responded to the call of the missing boater. However, at the scene, he never spoke to Plaintiff, the unit commander. Instead, he interrogated one of her subordinate male officers, asking whether she had been at work and where one of the morning-shift officers was. (That officer's shift was over, and another had replaced him.) After leaving the scene, Georgas sent a message summoning Plaintiff and the on-duty male sergeant to his office on Tuesday morning.

49. On Tuesday, May 31, Georgas removed Plaintiff from her command of the Marine Unit and took away her police vehicle, citing the drowning as the purported basis for these actions. He did not discipline the male sergeant who, unlike Plaintiff, was on duty when the boater drowned.

50. Plaintiff's removal from command of the Marine Unit was motivated by sex discrimination. Citing an accidental drowning that Plaintiff could not have prevented was a pretext for discrimination. Georgas' conduct was opportunistic: he had wanted to remove Plaintiff, a woman, from command the moment she assumed command, via promotion by Superintendent McCarthy.

51. When Plaintiff was on her way out of the meeting, Georgas approached her and said, in words or substance, "This is your SPAR hearing [for the discipline on the locked desk drawer]. What is it you would like to say to me?" Plaintiff asked him to send her hearing request to the Chief of Patrol.

52. Two days later, Plaintiff met with Chief of Patrol, Fred Waller, to discuss the SPAR. Chief Waller acknowledged Georgas' pattern of conduct in

attempting to remove officers who are not "*his guys*." To Plaintiff's knowledge, the SPAR has been left as a "violation noted" in her record.

53. On June 7, 2016, at approximately 2:15 p.m., Plaintiff filed an internal workplace discrimination complaint with the Office of Legal Affairs, asserting that she had been subjected to unlawful sex discrimination. Specifically, Plaintiff complained that Georgas had imposed unwarranted discipline upon her, including terminating her command of the Marine Unit, because of her sex, in violation of CPD workplace policy and Title VII.

54. Less than two hours later, Georgas conducted a meeting of Marine Unit supervisors, all of them male, after telling Plaintiff not to attend. A male Helicopter Unit sergeant also attended the meeting. On information and belief, after male sergeants at the meeting complained of staffing shortages in the unit, Georgas directed Marianovich to mandate officer overtime. This was after he had ignored every request by Plaintiff, over the course of many months, to address chronic staffing shortages in her unit.

55. Shortly after that meeting, at around 6 p.m. on June 7, several male officers from the meeting filed a retaliatory complaint against Plaintiff. Although the complaint was filed almost two years ago, the City has never shown Plaintiff a copy. However, she has been told that it is a spurious sexual harassment complaint, alleging that she touched an officer's arm without his consent.

56. After Plaintiff filed her internal harassment and discrimination complaint, an officer in CPD's Office of Legal Affairs emailed her a letter, asking if

13

she would like to be moved to a different unit as a remedy. She told him that she did *not* want to be transferred but that she wanted Georgas' conduct to stop.

57. After refusing transfer, the Chief of Patrol notified Plaintiff that she was being involuntarily transferred to the Major Accident Investigation Unit. On June 8, 2016, she was formally removed from her command of the Helicopter Unit (having already been removed from command of the Marine Unit) and sent to the Major Accident Investigation Unit—based upon sex discrimination and in retaliation for the filing of an internal sex discrimination complaint.

58. Thus, despite her outstanding record of service during more than two decades with the Chicago Police Department, Plaintiff was subjected to unlawful harassment and unwarranted discipline, denied training opportunities, and removed from her command of the Marine and Helicopter Unit—because of her sex. She was also subjected to unlawful retaliation—removal from command of the Helicopter Unit and involuntary transfer out of her unit—for filing an internal sex discrimination complaint.

59. On October 11, 2016, Plaintiff filed a charge of sex discrimination and retaliation with the EEOC, alleging that the facts described above violated her rights under Title VII. On November 2, 2016, the City submitted its position statement to the EEOC. In response to Plaintiff's charge, the City did not deny that it had discriminated against Plaintiff on the basis of her sex or retaliated against her. Instead, the City stated:

> Complainant alleges the City, though the Chicago Police Department ("CPD"), discriminated against her on the basis of her gender in

14

violation of Title VII, by targeting Complainant for harassment and retaliation because of her gender, and by ultimately demoting Complainant from her position as the Commanding Officer of the Marine and Helicopter Unit and transferring Complainant to the CPD Major Accident Investigation Unit. Without waiving any objection, including as to the timeliness of the allegations, *the City states that it lacks knowledge or information to admit or deny the allegations in the Charge.* The City further states that CPD's Bureau of Internal Affairs ("BIA") is in the process of conducting an internal investigation into the allegations in Complainant's Charge. The City will amend its Response to the Charge and its Position Statement upon completion of the BIA's internal investigation.

See attached Exhibit A (emphasis supplied).

60. Plaintiff is informed and believes that the BIA took statements from Georgas and several other officers implicated in the discrimination and retaliation against her. However, the City did not provide transcripts of these interviews to the EEOC or amend its position statement. Plaintiff has not been informed of the outcome of the BIA investigation and has been afforded no relief for the City's unlawful discrimination and retaliation.

**FIRST CLAIM FOR RELIEF**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et seq.***
**Sex Discrimination**

61. Plaintiff incorporates by reference the preceding paragraphs as alleged above.

62. Through the actions described above, Defendant intentionally discriminated against Plaintiff based upon her sex by subjecting her to adverse treatment, including but not limited to the imposition of unwarranted discipline, the denial of training opportunities, the opening of a spurious Internal Affairs complaint, and the termination of her command of the Marine and Helicopter Unit.

15

63. As a result of Defendant's unlawful discrimination, Plaintiff has suffered injuries including but not limited to the loss of training and promotional opportunities, damage to her reputation, and severe mental anguish and emotional distress, including physical illness associated with such distress.

**SECOND CLAIM FOR RELIEF**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e)** *et seq.*
**Hostile Work Environment**

64. Plaintiff incorporates by reference the preceding paragraphs as alleged above.

65. Through the actions described above, Defendant subjected Plaintiff to a hostile work environment based upon her sex, in violation of Title VII.

66. As a result of Defendant's unlawful discrimination, Plaintiff has suffered injuries including but not limited to severe mental anguish and emotional distress, including physical illness associated with such distress.

**THIRD CLAIM FOR RELIEF**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e)** *et seq.*
**Retaliation**

67. Plaintiff incorporates by reference the preceding paragraphs as alleged above.

68. Through the actions described above, Defendant retaliated against Plaintiff for the filing of an internal sex discrimination complaint, in violation of Title VII.

69. As a result of Defendant's unlawful retaliation, Plaintiff suffered injuries including but not limited to damage to her reputation, the loss of

16

promotional opportunities, and severe mental anguish and emotional distress, including physical illness associated with such distress.

## FOURTH CLAIM FOR RELIEF
### Illinois Civil Rights Act, 740 ILCS 23/5

70. Plaintiff incorporates by reference the preceding paragraphs as alleged above.

71. Through the actions described above, Defendant subjected Plaintiff to discrimination on the basis of her sex, in violation of 740 ILCS 23/5.

72. As a result of Defendant's violation of the Illinois Civil Rights Act, Plaintiff has suffered damages including but not limited to the loss of training and promotional opportunities, damage to her reputation, and severe mental anguish and emotional distress, including physical illness associated with such distress.

## FIFTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress
### (Respondeat Superior)

73. Plaintiff incorporates by reference the preceding paragraphs as alleged above.

74. The acts and conduct described above were extreme and outrageous. The misconduct included but was not limited to a conspiracy by Georgas and male CPD officers to draft and file a spurious Internal Affairs report, scapegoating Plaintiff for the drowning death of a civilian in order to cover up Georgas' own failure to adequately staff the Marine Unit, and using a tragic accident that Plaintiff could not have prevented as a pretext to remove her from her command.

17

75. The misconduct was undertaken with malice, willfulness, and reckless indifference to the rights of others.

76. As a direct and proximate result of the extreme and outrageous conduct, Plaintiff suffered severe mental anguish and emotional distress, including physical illness associated with such distress.

77. In committing the acts alleged above, Georgas and each of the individual officers involved were members of, and agents of, the Chicago Police Department acting at all times relevant within the scope of their employment.

78. Defendant City of Chicago is liable as principal for the intentional infliction of emotional distress committed by its agents.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A. A declaratory judgment that the practices complained of herein are unlawful and violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* and the Illinois Civil Rights Act, 740 ILCS 23/5;

B. An order reinstating Plaintiff to her position as commanding officer of the Marine and Helicopter Unit and ordering other appropriate injunctive relief;

C. An award of compensatory damages;

D. An award of Plaintiff's costs, including reasonable attorneys' fees and expenses as provided for in 42 U.S.C. § 2000e-5(k) and 740 ILCS 23/5;

E. An order awarding Plaintiff pre-judgment and post-judgment interest; and

F.   All other legal and equitable relief the Court deems appropriate.

## JURY DEMAND

Plaintiff demands trial by jury on all claims and issues that may be tried to a jury.

Dated:  March 15, 2018     Respectfully submitted,


/s Marni Willenson
Marni Willenson
marni@willensonlaw.com
Samantha Kronk
skronk@willensonlaw.com
Willenson Law, LLC
542 S. Dearborn Street, Suite 610
Chicago, IL  60605
(312) 508-5380
(312) 508-5382 (Fax)

Attorneys for Plaintiff

19