## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ALLISON SCHLOSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-cv-1880 |
| | ) | |
| CITY OF CHICAGO, a municipal | ) | Judge Thomas M. Durkin |
| corporation, and DEPUTY CHIEF | ) | |
| STEVE E. GEORGAS, COMMANDER | ) | Mag. Judge Maria Valdez |
| WARREN RICHARDS, SGT. | ) | |
| FREDERICK HARNISH, SGT. KAROLY | ) | |
| HADJU, ANGEL ROMERO and | ) | |
| ROBERT FITZSIMMONS, in their | ) | JURY DEMANDED |
| individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff Allison Schloss alleges the following against Defendants the City of
Chicago (the "City"), Deputy Chief Steve E. Georgas, Commander Warren Richards,
Sgt. Frederick Harnish, Sgt. Karoly ("Karl") Hadju, Sgt. (Ret.) Angel ("Dave")
Romero, and Sgt. (Ret.) Robert Fitzsimmons:

## I.    NATURE OF THE CLAIM

1.    This is an action brought to remedy discrimination in employment on
the basis of sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"),
as amended, 42 U.S.C. §§ 2000e *et seq.*, the Equal Protection Clause, the Illinois
Civil Rights Act, 740 ILCS 23/5(a)(1), and the Illinois Whistleblower Act, 740 ILCS
174/15(b).

2.     Plaintiff challenges the Chicago Police Department's ("CPD" or "Department") deep-seated pattern or practice, and unconstitutional custom or practice, of sex discrimination against women applying for promotion to and employed in prestigious units in CPD's "Special Functions" Division.

3.     Plaintiff seeks declaratory and injunctive relief and other equitable make-whole relief both to secure future protection and to redress the past deprivation of the rights secured to her under federal and state law.

4.     Plaintiff is a retired female sworn officer of the Chicago Police Department who held the rank of lieutenant for 17 years. In May 2014, she was promoted by former Superintendent Garry McCarthy and served as the first (and only) female commanding officer of the Marine and Helicopter Unit until June 2016, when she was removed from her command—because of her sex.

5.     While in command of the Marine and Helicopter Unit, Plaintiff was targeted for harassment and discrimination by Steve E. Georgas, the acting deputy chief and later deputy chief of CPD's Special Functions Division. The Special Functions Division ("Special Functions") includes the Marine and Helicopter Unit, the Bomb Squad, the Special Weapons and Tactics (SWAT) Team, and other high-profile operations from which women have been—and continue to be—largely excluded from employment.

6.     The number of women employed in Special Functions during Deputy Chief Georgas' command was abysmal—and remains so today. Based upon data available in March 2016, just before Georgas removed Plaintiff from her command:

2

    A. 0 of 15 members (0%) of the Bomb Squad (title code 9158, D3 pay) were women;

    B. 0 of 66 members (0%) of the SWAT team, a prestigious position with training opportunities and extensive overtime, were women;

    C. at most 1 of 25 (4%) Marine Unit officers (title code 9168, D2 pay) was a woman, and she was detailed out to another unit. (Plaintiff did have one other female Marine Unit officer in training and another female officer, in a different title code, working as her Marine Unit secretary);

    D. 0 of 5 (0%) Helicopter Unit officers (title code 9154) were women. (The officer working as Plaintiff's Helicopter Unit secretary, in a different title code, was a woman);

    E. 4 of 42 (9.5%) explosives detection canine handlers (title code 9153, D2 pay) were women;

    F. 3 of 21 (14%) Mounted Unit officers (title code 9169, D2 pay) were women.

7. Since then, the numbers have not moved in the right direction. In June 2016, Georgas removed Plaintiff—the only woman to ever command the Marine and Helicopter Unit—from her command. Based upon CPD data from March 2018, when Plaintiff filed this lawsuit:

    A. 0 of 11 members (0%) of the Bomb Squad (title code 9158, D3 pay) were women;

3

   B. 0 of 72 members (0%) of the SWAT team were women;

   C. 2 of 31 (6.4%) Marine Unit officers (title code 9168, D2 pay) were

      women;

   D. 0 of 4 (0%) Helicopter Unit officers (title code 9154) were women;

   E. 6 of 44 (13.6%) explosives detection canine handlers (title code

      9153, D2 pay) were women.

8.    On information and belief, in December 2017, the City appointed and assigned one male to the Bomb Squad. In July 2018, the City appointed and assigned five males and one female to the Bomb Squad and sent them to the FBI's training course at the Redstone Arsenal in Huntsville, Alabama.[1]

9.    Deputy Chief Georgas permitted, modeled, and fueled gender-based resistance to Plaintiff's command by her male subordinate officers. He scapegoated her, harassed her, humiliated her, and intentionally undermined her command.

10.    On May 31, 2016, Georges terminated Plaintiff's command of the Marine Unit, because of her sex.

11.    On June 7, 2016, at approximately 2:15 p.m., Plaintiff filed an internal workplace discrimination complaint with the Office of Legal Affairs, asserting that she had been subjected to unlawful sex discrimination. Specifically, Plaintiff complained that Georgas had imposed unwarranted discipline upon her, including

---

[1] On March 18, 2018, Det. Maureen Bresnahan filed a sex discrimination lawsuit against the City challenging her rejection for promotion to the Bomb Squad and alleging a pattern and practice of discrimination against women in Special Functions. *See Bresnahan v. City of Chicago*, Case No. 18-C-1974 (N.D. Ill.). This Court subsequently determined that *Bresnahan* is related to *Schloss*; upheld the *Monell* claims in both cases; and consolidated them for discovery.

terminating her command of the Marine Unit, because of her sex, in violation of CPD workplace policy and Title VII.

12. Less than two hours later, Georgas conducted a meeting of Marine Unit supervisors, all of them male, after telling Plaintiff not to attend. Defendants Fitzsimmons, Romero, Hadju, and Harnish were present at the meeting. Together, Defendants conspired to have a spurious sexual harassment complaint filed against Plaintiff, to create a pretext for removing her from command.

13. On June 8, 2016, Georgas terminated Plaintiff's command of the Helicopter Unit, because of her sex and in retaliation for the sex discrimination complaint she filed on June 7.

14. Georgas was assigned to Detached Services effective September 1, 2016 and no longer serves as deputy chief of Special Functions.

## II.  JURISDICTION AND VENUE

15. This Court has jurisdiction over Plaintiff's federal claims pursuant to 42 U.S.C. § 2000e-5(f)(3) (Title VII) and 28 U.S.C. §§ 1331 (federal question) and 1443 (civil rights).

16. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because a Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims alleged occurred in this District.

## III.  PARTIES

**A.  <u>Plaintiff</u>**

18.  Plaintiff Allison Schloss is a woman and a retired CPD lieutenant.

19.  Plaintiff has met all administrative prerequisites to the filing of this lawsuit under Title VII. On October 11, 2016, she filed a charge of sex discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). She filed this lawsuit within 90 days of her receipt of notice of her right to sue from the EEOC.

**B.  <u>Defendants</u>**

20.  The City is and was at all times relevant a municipal corporation organized and existing under the laws of Illinois.

21.  The City is and was at all times relevant Plaintiff's "employer" as defined by Title VII.

22.  Defendant Steve E. Georgas is a CPD deputy chief and was at all times relevant acting under color of law. He is sued in his individual capacity.

23.  Defendant Warren Richards is a CPD commander and was at all times relevant acting under color of law.  He is sued in his individual capacity.

24.  Defendant Sgt. Frederick Harnish is a CPD police sergeant and was at all times relevant acting under color of law. He is sued in his individual capacity.

25.  Defendant Sgt. Karoly ("Karl") Hadju is a CPD police sergeant and was at all times relevant acting under color of law. He is sued in his individual capacity.

26.     Defendant Angel ("Dave") Romero is a retired CPD police sergeant and was at all times relevant acting under color of law. He is sued in his individual capacity.

27.     Defendant Robert Fitzsimmons is a retired CPD police sergeant and was at all times relevant acting under color of law. He is sued in his individual capacity.

## IV.     ADDITIONAL FACTUAL ALLEGATIONS RELATED TO CPD'S DISCRIMINATION AGAINST PLAINTIFF

28.     Plaintiff was a sworn CPD officer for 29 years, beginning in March 1990 and continuing to June 2019. In June 2019, she was forced into retirement as a result of retaliation for asserting her rights under Title VII and the Equal Protection Clause, including by bringing this lawsuit. During her career at CPD, she was promoted up the ranks twice, first to sergeant, in April 1996, and later to lieutenant, in March 2002. The most recent position Plaintiff reported to was as the commanding officer of CPD's Major Accident Investigations Unit ("MAIU").

29.     Plaintiff is also a federal special agent for the United States Coast Guard Reserve, Coast Guard Investigative Service. She has been a member of the Coast Guard since January 2001. She has received many medals, awards, and commendations from the Coast Guard Reserve, including letters of commendation from the special agent-in-charge of the Coast Guard Investigative Service and the president of the Marine Navigation and Training Association.

30.     The Chicago Police Department operates a number of specialized, high profile, and prestigious units, including the Bomb Squad, SWAT Team, Helicopter

and Marine Unit, and Mounted Police. These units fall within CPD's Special Functions Division. In addition, CPD employs Explosives Detection Canine Handlers (title code 9153), a prestigious promotional position, in the Special Functions Division.

31.    Each Special Functions Division unit has a commanding officer who reports to the deputy chief of the division.

32.    From July 2012 until on or around September 1, 2016, Deputy Chief Steve E. Georgas was in charge of all Special Functions Division units.

33.    The City has historically excluded women from employment in the Special Functions Division, especially in its most high profile and prestigious units and job titles. This pattern was perpetuated during Georgas' tenure as deputy chief. He selected no female commanders to any unit under his command. During his tenure, the SWAT Team and Bomb Squad had zero (0) female officers. The Marine and Helicopter Unit had at most one female officer (not counting Plaintiff, the commanding officer, placed there by Superintendent McCarthy) and two female secretaries. As of March 2016, only 4 of 42 (9.5%) of the explosives detection canine handlers were women, and only 3 of 21 (14%) mounted unit officers were women.

34.    Both historically and today, the only Special Functions Division unit with a significant presence of female officers is Special Activities, which provides crisis intervention, outreach to families of fallen officers, school visitation, and other stereotypically "female" support functions. These positions are not promotional or prestigious and do not offer a pay increase or title code change.

8

35. In May 2014, despite the historic obstacles faced by women applying to Special Functions units, Superintendent Garry McCarthy promoted Plaintiff to commanding officer of the Marine and Helicopter Unit.

36. Steve Georgas, then acting deputy chief of Special Functions, interviewed Plaintiff for the commanding officer position, but did not make the decision to promote Plaintiff.

37. As commanding officer of the Marine and Helicopter Unit, Plaintiff was in charge of the policing of all bodies of water within the City of Chicago and all CPD helicopter operations. She reported at all times to Georgas.

38. Plaintiff was the first—and has been the only—female commanding officer of the Marine and Helicopter Unit.

39. Georgas resented and bridled at Plaintiff's command of his units. He did not place her there, and he did not want a woman in the post.

40. For the duration of her command, Georgas targeted Plaintiff for harassment and discriminated against her on the basis of her sex.

41. Some, but not all, of the harassment and discrimination took the form of scapegoating: blaming Plaintiff for real or perceived problems that were not within the scope of her responsibilities, to create a pretext for unwarranted discipline and to tarnish her record.

42. Repeatedly, Georgas directed Plaintiff to write reports explaining alleged faults or problems, even if she bore no responsibility for the incident. Then, after she submitted her report, he would claim that he misplaced it, or did not

receive it, and require her to re-write it. On numerous occasions, he demanded that she write a report on why a report was missing. This conduct disrupted her from carrying out her duties as commanding officer. Georgas targeted Plaintiff for this harassment because of her sex.

43.     Georgas frequently demanded that Plaintiff explain, justify, or rectify circumstances that she did not, and could not, control. His conduct was a manifestation of his hostility to Plaintiff, as a woman, in a position of command.

44.     For example, on May 4, 2016, the unit received notification that the City was behind on payments to the company that repairs and maintains CPD helicopters. As commander of the Helicopter Unit, Plaintiff had no control over those payments; and unlike Georgas, a deputy chief, she had neither the job title nor the clout to pressure CPD Financial Operations to make the late payments. Nevertheless, Georgas demanded that she write a "plan" on how to "rectify the issue" and send it to Captain Mark Marianovich by the end of the day. The order was patronizing, insolent, and a useless expenditure of Plaintiff's time. Georgas did not require male commanding officers of his units to expend command time writing memos with "plans" to "rectify" problems they could not repair.

45.     In addition to targeting Plaintiff for harassment, Georgas repeatedly denied her approval to attend training, while routinely approving such training requests from male officers. For example, on July 1, 2015, she submitted a request to attend a free four-day Search Coordination and Execution course offered by the U.S. Coast Guard. The training was designed for on-scene coordinators in search

10

and rescue operations, highly relevant to Plaintiff's work and responsibilities as commanding officer of CPD marine operations. Georgas denied approval for Plaintiff to attend this course, on the (alleged) basis that it was during boating season. However, the course was scheduled after the end of all major boating season events. In fact, Georgas denied Plaintiff the training opportunity because of her sex.

46.     Similarly, in January 2016, Georgas denied Plaintiff's request for approval to attend a regional safety seminar conference for helicopter unit managers on the proper use of equipment and air patrol policies. Again, he denied her a valuable training opportunity because of her sex.

47.     In addition, Georgas routinely countermanded Plaintiff's orders, intentionally undermining her authority with subordinate officers. In contrast, he did not countermand the orders of his male unit commanders or engage in conduct that undermined their authority with subordinate officers. Georgas intentionally undermined Plaintiff's standing with her male subordinates, because of her sex.

48.     For example, in January 2016, one of Plaintiff's male subordinate officers made a request to take 13 days off. However, the days he requested were not during his assigned vacation time; and the number of days he was requesting was in excess of CPD policy. Plaintiff therefore denied the request, to follow CPD policy and to avoid an officer shortage.

49.     Georgas not only overruled Plaintiff's decision—he instructed her to personally notify the subordinate officer that the time was being approved. Although she was unable to provide immediate notice, because the officer had left

early for the weekend, she left the approval notice in his mailbox and then met with him early the following week to confirm that his time off was now approved.

50.     Subsequently, Georgas disciplined Plaintiff for not notifying the absent officer sooner.

51.     Georgas targeted Plaintiff for that discipline because of her sex. He did not discipline male commanders on trumped-up charges, countermand their legitimate orders, or attempt to humiliate them in front of subordinates.

52.     On January 15, 2016, Plaintiff began an authorized leave, and a male lieutenant temporarily assumed her responsibilities in her absence. On January 25, all units were required to send officers to Taser training. Since Plaintiff was on leave, it was the responsibility of the lieutenant in command to send officers to training, which he failed to do. However, when Plaintiff returned from leave, she ensured that all of her officers completed Taser training.

53.     Shortly thereafter, and consistent with his pattern of harassment and discrimination against Plaintiff, Georgas oversaw the issuance of formal discipline against her, both for the male lieutenant's failure to send officers to Taser training during her authorized leave and also for not immediately notifying the absent male officer that his time off request was approved.

54.     In April 2016, Plaintiff received a confidential personnel report from human resources on a Marine Unit officer, which required a response from her. She sent a copy of her confidential memo to Deputy Chief Georgas' secretary via both department mail (in hard copy) and email. She then locked the hard copy of the file

in her office drawer, to ensure its confidentiality while she was away from the office on a short military leave. Locking up this material was consistent with CPD procedures for the handling of sensitive personnel information.

55.     When she returned from military leave, Georgas instructed Captain Marianovich to issue a Summary Punishment Action Report ("SPAR") against her, for locking the confidential documents in her office drawer. The SPAR alleged that, by locking up the report, she had prevented someone who needed it from accessing it while she was away. The allegation was spurious. When he issued the SPAR, Captain Marianovich acknowledged as much and recommended that Plaintiff request a hearing on it. She did so immediately.

56.     Georgas' scapegoating reached its pinnacle in May 2016. On May 9, 2016, Plaintiff presented Captain Marianovich with her projections for the number of officers needed in the Marine and Helicopter Unit to adequately staff the 2016 boating season, including heavy boating holidays (Memorial Day Weekend, July 4th, and Labor Day Weekend). The spreadsheet reflected that the unit did not have a sufficient number of trained officers in the event of an emergency, which she and Marianovich also discussed. Plaintiff received no direction on how to deal with the projected manpower shortage and was provided with no additional resources. Moreover, she was under orders not to allow officers in her unit to work overtime.

57.     On May 20, 2016, she sent an email to Marianovich, requesting extra officers over Memorial Day Weekend and proposing a plan for the staff schedule, which included deploying each of the two CPD helicopters. Again, she received no

13

response. Without approval from her commanding officer, Plaintiff did not have the authority to staff and deploy both helicopters or to permit officers to work overtime.

58.     On Friday evening of Memorial Day Weekend (May 27), Georgas suddenly demanded that the unit have both helicopters running all weekend. Despite the delay in the order, Plaintiff was able to deploy both helicopters all weekend. The manpower in the unit was still insufficient, however, as Plaintiff had notified Marianovich it would be.

59.     Plaintiff was not scheduled to be on duty over the weekend. One crew with four marine officers and one sergeant were on duty each shift.

60.     On Sunday afternoon, a boater was reported missing on Lake Michigan. Plaintiff was not on duty at the time, because it was not her shift. However, when the report came in, she responded immediately to the unit and took charge of the search. Despite extraordinary efforts to rescue the boater, he drowned.

61.     Although it was not Georgas' practice to report to such calls, he responded to the call of the missing boater. However, at the scene, he never spoke to Plaintiff, the unit commander. Instead, he interrogated one of her subordinate male officers, asking whether she had been at work and where one of the morning-shift officers was. (That officer's shift was over, and another had replaced him.) After leaving the scene, Georgas sent a message summoning Plaintiff and the on-duty male sergeant to his office on Tuesday morning.

62.     On Tuesday, May 31, Georgas removed Plaintiff from her command of the Marine Unit and took away her police vehicle, citing the drowning as the

14

purported basis for these actions. He did not discipline the male sergeant who, unlike Plaintiff, was on duty when the boater drowned.

63. Plaintiff's removal from command of the Marine Unit was motivated by sex discrimination. Citing an accidental drowning that Plaintiff could not have prevented was a pretext for discrimination. Georgas' conduct was opportunistic: he had wanted to remove Plaintiff, a woman, from command the moment she assumed command, via promotion by Superintendent McCarthy.

64. When Plaintiff was on her way out of the meeting, Georgas approached her and said, in words or substance, "This is your SPAR hearing [for the discipline on the locked desk drawer]. What is it you would like to say to me?" Plaintiff asked him to send her hearing request to the Chief of Patrol.

65. Two days later, Plaintiff met with Chief of Patrol, Fred Waller, to discuss the SPAR. Chief Waller acknowledged Georgas' pattern of conduct in attempting to remove officers who are not "*his guys*." To Plaintiff's knowledge, the SPAR has been left as a "violation noted" in her record.

66. On June 7, 2016, at approximately 2:15 p.m., Plaintiff filed an internal workplace discrimination complaint with the Office of Legal Affairs, asserting that she had been subjected to unlawful sex discrimination. Specifically, Plaintiff complained that Georgas had imposed unwarranted discipline upon her, including terminating her command of the Marine Unit, because of her sex, in violation of CPD workplace policy and Title VII.

15

67.     On information and belief, Chief Fred Waller notified Georgas of Schloss' complaint, at approximately 5:20 p.m. on June 7, 2016.

68.     Less than two hours after Schloss filed her complaint, Georgas conducted a meeting of Marine Unit supervisors, all of them male, after telling Plaintiff not to attend. Defendants Fitzsimmons, Harnish, Romero, and Hadju were all present at the meeting.

69.     On information and belief, after male sergeants at the meeting complained of staffing shortages in the unit, Georgas directed Marianovich to mandate officer overtime. This was after he had ignored every request by Plaintiff, over the course of many months, to address chronic staffing shortages in her unit.

70.     Defendants Georgas, Fitzsimmons, Harnish, Romero, and Hadju conspired at the June 7, 2016 meeting to have a spurious sexual harassment complaint filed against Plaintiff, as a pretext to remove her from command.

71.     At the June 7, 2016 meeting, Defendants conspired to commit intentional discrimination against Plaintiff, based upon her sex.

72.     Shortly after that meeting, at around 6 p.m. on June 7, several male officers from the meeting—including Defendants Fitzsimmons, Harnish, Romero, and Hadju—filed a retaliatory complaint against Plaintiff. Although the complaint was filed almost three years ago, the City has never shown Plaintiff a copy. However, she was told that, and documents produced in this litigation confirm, that it is a spurious sexual harassment complaint, alleging that she touched an officer's arm without his consent.

16

73.     After Plaintiff filed her internal harassment and discrimination complaint, an officer in CPD's Office of Legal Affairs emailed her a letter, asking if she would like to be moved to a different unit as a remedy. She told him that she did *not* want to be transferred but that she wanted Georgas' conduct to stop.

74.     After refusing transfer, the Chief of Patrol notified Plaintiff that she was being involuntarily transferred to the Major Accident Investigation Unit. On June 8, 2016, she was formally removed from her command of the Helicopter Unit (having already been removed from command of the Marine Unit) and sent to the Major Accident Investigation Unit—based upon sex discrimination and in retaliation for the filing of an internal sex discrimination complaint.

75.     Thus, despite her outstanding record of service during more than two decades with the Chicago Police Department, Plaintiff was subjected to unlawful harassment and unwarranted discipline, denied training opportunities, and removed from her command of the Marine and Helicopter Unit—because of her sex. She was also subjected to unlawful retaliation—removal from command of the Helicopter Unit and involuntary transfer out of her unit—for filing an internal sex discrimination complaint.

76.     On October 11, 2016, Plaintiff filed a charge of sex discrimination and retaliation with the EEOC, alleging that the facts described above violated her rights under Title VII. On November 2, 2016, the City submitted its position statement to the EEOC. In response to Plaintiff's charge, the City did not deny that

17

it had discriminated against Plaintiff on the basis of her sex or retaliated against her. Instead, the City stated:

> Complainant alleges the City, though the Chicago Police Department ("CPD"), discriminated against her on the basis of her gender in violation of Title VII, by targeting Complainant for harassment and retaliation because of her gender, and by ultimately demoting Complainant from her position as the Commanding Officer of the Marine and Helicopter Unit and transferring Complainant to the CPD Major Accident Investigation Unit. Without waiving any objection, including as to the timeliness of the allegations, *the City states that it lacks knowledge or information to admit or deny the allegations in the Charge.* The City further states that CPD's Bureau of Internal Affairs ("BIA") is in the process of conducting an internal investigation into the allegations in Complainant's Charge. The City will amend its Response to the Charge and its Position Statement upon completion of the BIA's internal investigation.

See attached Exhibit A (emphasis supplied).

77.     Plaintiff is informed and believes that the BIA took statements from Georgas and several other officers implicated in the discrimination and retaliation against her. However, the City did not provide transcripts of these interviews to the EEOC or amend its position statement. Plaintiff has not been informed of the outcome of the BIA investigation and has been afforded no relief for the City's unlawful discrimination and retaliation.

78.     Plaintiff's EEOC investigative file contains documents evidencing that, during the EEOC's investigation of Plaintiff's charge of discrimination and retaliation, Defendants Fitzsimmons, Harnish, and Romero attempted to file spurious sexual harassment charges against Plaintiff. The EEOC refused to accept the charges because the conduct alleged did not violate Title VII.

## V.    ADDITIONAL ALLEGATIONS RELATED TO CPD'S PATTERN OR PRACTICE, AND CUSTOM OR PRACTICE, OF SEX DISCRIMINATION AGAINST WOMEN IN THE SPECIAL FUNCTIONS DIVISION

79.    Plaintiff's experience of being subjected to a hostile work environment and removed from her command of the Marine and Helicopter Unit evidences, and is the result of, the City's unlawful pattern or practice, and its unconstitutional custom or practice, of sex discrimination against women applying for promotion to and employed in the Special Functions Division.

80.    The City's hostility toward women in the prestigious Special Functions units is too pervasive to be unintended. The intentionality of the hostility is unmistakable given how often and thoroughly it manifests itself. Both alone and together, the following examples lead almost inexorably to the conclusion that the City is now, and for years has been, intentionally deterring and preventing fully qualified women from enjoying equal employment opportunities in CPD's Special Functions Division. These acts and omissions cannot plausibly be explained except as a pattern, practice, and custom of intentional sex discrimination:

a)    The City has a long history of excluding women from jobs in the Special Functions Division. The statistics set forth in paragraphs 6 and 7 above evidence systemic and continuing discrimination against women in the most prestigious and sought-after Special Functions units.

b)    The City also has a long and persistent history of excluding women from command positions in Special Functions. Plaintiff's experience

19

exemplifies and evidences a deep-seated bias against women serving as commanding officers in Special Functions. The City is aware of the problem but has taken inadequate, if any, steps to remedy it.

c)      The City's sexually biased selection procedures for the Bomb Squad and other Special Functions units include the use of subjective, non-blinded oral interviews. Such procedures inject discriminatory animus, gender bias, and gender stereotyping into the selections process. The City has taken inadequate, if any, measures to eliminate gender bias from the oral interview process for promotions to positions in Special Functions. On information and belief, the use of oral interviews in the application process for positions in Special Functions has resulted, and continues to result, in systemic sex discrimination against women.

d)      The City's final decisions on promotions to the Bomb Squad and, on information and belief, to other Special Functions units are based almost entirely on subjective criteria. In fact, the City's use of written tests for promotions in Special Functions is, for the most part, an artifice. For example, the City uses a written test for the Bomb Squad but then invites the top 75 candidates to an oral interview. By inviting the top 75 candidates to interview and providing no advantage in final selection decisions to the top-scoring candidates, the City diminishes reliance upon the written test. Instead, it makes promotions decisions based upon subjective interviews, permitting unlawful and unconstitutional discrimination to contaminate the promotions process.

20

e) On information and belief, and using a similar *modus operandi*, the City also has a long history of using invalid physical testing to deny promotions to and remove qualified women applying to or in training for certain Special Functions units, including the SWAT Team and Marine Unit.

f) The City's intent to discriminate against women in Special Functions is also evidenced by its treatment of Det. Maureen Bresnahan, who was denied promotion to the Bomb Squad because of gender stereotyping and discrimination: after achieving the top score on the Bomb Squad promotions test, Det. Bresnahan was denied promotion because the hiring manager, Sgt. James Egan, and two other men conducting the oral interviews, deemed her "best suited" for "clerical" or "office" work.

g) The City's intent to discriminate against women in Special Functions is further evidenced by its treatment of Ofc. Melissa Tapia, an experienced and certified diver, who was removed from Marine Unit training and denied permanent assignment to the Unit based upon *ad hoc* and discriminatory physical tests and sex-based animus.

g) The City's intent to discriminate against women is also evidenced by its use of recruitment materials that reflect gender stereotyping, do not portray women working in prestigious, specialized units, and hardly depict women out on the street.

h)     The City's intent to discriminate against women is also evidenced in its many public statements celebrating the hiring of "diverse" Police Academy classes with no mention of gender diversity.

81.     In contrast to the selection procedures used in Special Functions, the City's procedures for other promotions, including to evidence technician, detective, sergeant, and lieutenant, incorporate measures intended to reduce discriminatory bias. Specifically, the written test scoring sheets are blinded to remove the candidates' names and other indicia of their race and sex so that racial and gender biases do not infiltrate the promotions process.

82.     The City is and has been aware that its selection procedures in Special Functions result in systemic discrimination against women. In addition, it is and has been aware of the availability and efficacy of alternative selection procedures, including ones used for other promotions in the Department, to reduce or eliminate gender bias. Yet, despite the availability of measures to enhance equal employment opportunities for women, the City has taken no steps to replace its discriminatory promotions procedures in Special Functions with neutral ones, resulting in an unlawful pattern and practice, and an unconstitutional custom and practice, of discrimination against women.

83.     In addition, the City is and has been aware of the pattern and practice of sex discrimination against women serving in, and denied promotion to, command positions in the Special Functions Division.

22

84. The City has acted with deliberate indifference to the discrimination against women in the Special Functions Division.

85. Unless restrained by the Court, the City will continue to employ policies, practices, and procedures that have no legally defensible job-related justification and discriminate against women, including by using practices either the same as or similar to those alleged in this complaint.

## VI. ADDITIONAL ALLEGATIONS RELATED TO CONTINUED RETALIATION BY THE CITY, RETALIATION BY COMMANDER WARREN RICHARDS AND CONSTRUCTIVE RETIREMENT

86. On January 2, 2018, Plaintiff was at a meeting at CPD's Office of Legal Affairs when Sgt. Fronczak of Legal Affairs advised her that they had received notice of the Right to Sue on Plaintiff's EEOC charge. Sgt. Fronczak asked Plaintiff when she was going to file her complaint against the City.

87. On January 4, 2018, Plaintiff received an email that a new sergeant was being detailed to MAIU and Plaintiff determined that sergeant would be assigned to first watch. The next day, after the announcement had been made welcoming the new sergeant, Sgt. Paulette Norwood called Plaintiff very upset. Sgt. Norwood advised Plaintiff that she had gone to Superintendent Eddie Johnson (Sgt. Norwood's ex-husband) to get the new sergeant assigned to MAIU so Sgt. Norwood could be reassigned to the second watch. Plaintiff advised Sgt. Norwood that she didn't need an additional sergeant on the second watch. Sgt. Norwood responded that the Superintendent had made this arrangement for her and if Plaintiff didn't

do what he and Sgt. Norwood wanted her to do, that Plaintiff "would have a real problem."

88.     On January 11, 2018, Sgt. Norwood took two members of MAIU—Sue Symanski and Paul Niezabitowski—to meet with Defendant Richards, who was Plaintiff's direct supervisor. On information and belief, Symanski and Niezabitowski complained to Richards that Plaintiff "talks down to them."

89.     Richards advised Sgt. Norwood at that meeting that she had 24 hours to "dot her i's and cross her t's" to register a complaint against Plaintiff (in CPD parlance, "obtain a CR number on Plaintiff"). Sgt. Norwood spent the next day approaching nearly every member of MAIU soliciting them to make complaints against Plaintiff. This action by Sgt. Norwood—at Richard's behest—is directly contrary to CPD policy.

90.     On January 12, 2018, Sgt. Norwood obtained CR #1088124 against Plaintiff. On CPD's records, Sgt. Norwood is listed as a "reporting party," and not as a victim or subject.

91.     On January 16, 2018, Plaintiff obtained a CR number against Sgt. Norwood for retaliation.

92.     On January 19, 2018, Richards called Plaintiff and told her she was being moved back to patrol; he did not say why she was being moved. A short time later, Richards called to advise Plaintiff that she was staying in MAIU.

93.     At the end of January 2018, responses sent from Plaintiff's unit to the FOIA unit, Subpoena unit, and Office of Legal Affairs began to be returned for

corrections to Plaintiff's unit by Richards. Since 2016, when Plaintiff was first assigned to MAIU, none of the unit's responses to file requests were ever returned for any type of correction.

94.     On March 15, 2018, Plaintiff filed this case.

95.     On March 29, 2018, Plaintiff and two of her sergeants were called to a meeting with Chief of Detectives Melissa Staples, Deputy Chief James Jones, and Richards. At that meeting, allegations were made that Plaintiff and her unit put fictitious reports into the system and that they had mis-handled cases. At the end of the meeting, Staples told Plaintiff and her sergeants, "the three of you have totally mismanaged this unit, you don't know what you are doing, and effective Sunday you are back in patrol." Plaintiff was later told that she was being assigned to the 5th District, which is the southeasternmost district in the City. Approximately two hours after Staples made her statement, Plaintiff was advised that neither she nor her sergeants were being reassigned.

96.     On April 5, 2018, Richards entered a comment into the Performance Recognition System under "Performance Coaching," falsely characterizing the meeting on March 29 as a counseling session. CPD policies and procedures regarding counseling sessions were not followed in connection with the March 29 meeting.

97.     Plaintiff was on furlough from April 14 to May 10, 2018. While she was on furlough, Chief Staples's office issued a list of file requests to which MAIU had allegedly never responded.  MAIU had not received several of the file requests;

many others MAIU had responded to but they were sitting in Richards's office. When Plaintiff returned from furlough, she received a counseling form relating to these file requests, which stated that Plaintiff was responsible to make sure the files were complete and accurate.

98.     Over the next month and a half, numerous files were returned to Plaintiff with reports explaining the reason for the return.

99.     On June 28, 2018, Richards issued a written reprimand to Plaintiff related to 20 files that had been returned since May 10, 2018. Many of the files were returned due to policy changes about which MAIU had never been informed. Plaintiff requested a hearing with the Deputy Chief with respect to this reprimand.

100.     On July 2, 2018, Plaintiff went to the Office of Legal Affairs to file an additional retaliation complaint and to obtain a CR number on Richards. About 30 minutes after leaving Legal Affairs, Richards called Plaintiff, extremely irate, demanding to know whether she had obtained a CR number on him. Plaintiff refused to answer Richards's question as it was inappropriate for her to have a conversation with him about the complaint.

101.     On July 27, 2018, Richards informed Plaintiff that she would not be allowed to work overtime without his explicit written permission.

102.     On October 23, 2018, Plaintiff attended a hearing with Deputy Chief Brendan Deenihan relating to the written reprimand issued by Richards on June 28, 2018. Plaintiff provided documentation relating to the allegedly incorrect reports, but Deenihan refused to review the documentation. Deenihan wrote in his

report of the hearing that Plaintiff acknowledged that the reports were incorrect, but Plaintiff made no such acknowledgement. Deenihan told Plaintiff he would have to contact Richards for his rebuttal, which is contrary to CPD policy and procedure.

103.     In early November 2018, Plaintiff and her unit secretary made a push to respond to numerous file requests because the secretary was going on furlough on November 6 and Plaintiff had a trip planned for the weekend of November 10. On November 9, 2018, Richards's administrative sergeant, Sgt. Chris Liakopoulous, brought a large stack of file requests back to MAIU, which were the file requests that Plaintiff and her unit secretary had just sent out. Files were returned as allegedly incorrect even though they were processed applying the method that Richards had advised Plaintiff in May needed to be followed.

104.     When Plaintiff returned from her weekend trip, she requested a standard operating procedure for processing of file requests by MAIU because there was no written guidance and Richards had repeatedly changed the rules relating to the processing of file requests.

105.     Plaintiff never received a standard operating procedure for the processing of file requests. Richards continued to change the procedures for MAIU's processing of file requests so he could continue to accuse her of doing it improperly.

106.     On April 18, 2019 at 11:59 a.m., Plaintiff filed in this action a motion for leave to file her Second Amended Complaint, which included additional allegations of retaliation against the City and new allegations of retaliation by Commander Richards. *See* Dkt. 79.

107.    On April 19, 2019, at approximately 3:30 p.m., while on military leave from the CPD, Plaintiff discovered a voice message on her CPD cell phone from Deputy Chief George Devereux. Plaintiff returned Devereux's call a short time later. Devereux advised Plaintiff that she was being moved from the MAIU to Violence Reduction Initiative ("VRI") North.  VRI North is located in the basement of the CPD building at Harrison and Kedzie. That is the same building where Commander Richards has his office. Prior to this transfer to VRI North, Plaintiff worked at 1718 S. State Street.

108.    VRI is an overtime program used to boost manpower around areas of higher violence in the City. On information and belief, Plaintiff's responsibilities in a position at VRI North would include assigning officers to work in high crime areas, similar to acting as a watch commander.

109.    The work at VRI would have been less prestigious than Plaintiff's previous assignment with MAIU. MAIU is part of the Detective Bureau, which is a more prestigious bureau than the Bureau of Patrol, which includes VRI. In addition, Plaintiff's responsibilities with the MAIU included working with investigators who are working towards charging offenders related to serious personal injury or fatal traffic crashes. MAIU officers regularly charge offenders with reckless homicide, or similar serious offenses, and MAIU cases are often featured in the news and its members regularly receive awards and other accolades for their work.

110.    On information and belief, Plaintiff would have had fewer opportunities to work overtime at VRI North than she had working in MAIU. Her

responsibilities in MAIU involved incidents to which Plaintiff needed to respond no matter the time of day.

111. VRI North's location at Harrison and Kedzie was a more inconvenient location for Plaintiff than her previous location with MAIU. Moreover, because of Richards's retaliatory conduct towards Plaintiff as outlined above, Plaintiff experienced significant distress at the prospect of working in the same building as him, where there was a possibility of running into him at any time.

112. On May 6, 2019, while she was sitting in the Medical Services Section, Devereaux met Plaintiff and, in the presence of others, handed her a Performance Evaluation form and a Performance Improvement Plan.

113. The Performance Evaluation form had been completed by Richards. It assigned Plaintiff a "needs improvement" rating on every aspect of her job. Plaintiff had never received a single "needs improvement" rating on *any* individual aspect of her performance in her 29 years of service in the CPD.

114. Plaintiff refused to sign the Performance Evaluation. Under CPD's Order relating to Performance Evaluations, Richards should have written "refused to sign" on the form and then signed and dated the form. Instead, Devereux instructed Schloss to write "refused" on the form.

115. That same day, Devereaux also gave Schloss a Performance Improvement Plan ("PIP") that related to her position in the MAIU. The PIP was dated March 29, 2019, with a start date of April 1, 2019, and was signed by

Richards and Deenihan. It outlined activities relating to Lt. Schloss's position in MAIU, from which she had been re-detailed on April 19, 2019.

116. Lt. Schloss could not complete the PIP because she was on medical leave from February 28, 2019 to May 31, 2019. She also could not complete the PIP because she was no longer assigned to the MAIU and all the objectives and activities in the PIP related to her job in MAIU.

117. The City and Richards engaged in all of the above conduct in retaliation for Plaintiff's internal complaints of sex discrimination, her filing of the EEOC charge, her participation in the EEOC investigation, her filing of this lawsuit, and her continued pursuit of this lawsuit, including by seeking leave to file a second amended complaint with claims against Richards.

118. The City's and Richards' relentless retaliation was designed to remove Plaintiff from her position with the CPD. Plaintiff continued to combat and challenge each instance of retaliation, but her working conditions became intolerable, and the constant battle was taking a toll on her emotional and physical health. As a result, she determined that she had no other option than to retire from the CPD. She retired on May 31, 2019.

**FIRST CLAIM FOR RELIEF**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e)** *et seq.*
**Sex Discrimination - Adverse Treatment**
**(Against the City of Chicago)**

119. Plaintiff incorporates by reference the preceding paragraphs as alleged above.

120.     Through the actions described above, the City intentionally discriminated against Plaintiff based upon her sex by subjecting her to adverse treatment, including but not limited to the imposition of unwarranted discipline, denial of training opportunities, opening of a spurious Internal Affairs complaint, and termination of her command of the Marine and Helicopter Unit.

121.     As a direct and proximate result of the City's unlawful discrimination, Plaintiff has suffered injuries including but not limited to the loss of her command position and training and promotional opportunities, damage to her reputation, and severe mental anguish and emotional distress, including physical illness associated with such distress.

## SECOND CLAIM FOR RELIEF
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et seq.*
### Sex Discrimination - Hostile Work Environment
### (Against the City of Chicago)

122.     Plaintiff incorporates by reference the preceding paragraphs as alleged above.

123.     Through the actions described above, the City subjected Plaintiff to a hostile work environment based upon her sex, in violation of Title VII.

124.     As a direct and proximate result of the City's unlawful discrimination, Plaintiff has suffered injuries including but not limited to severe mental anguish and emotional distress, including physical illness associated with such distress.

**THIRD CLAIM FOR RELIEF**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et seq*.**
**Retaliation**
**(Against the City of Chicago)**

125.     Plaintiff incorporates by reference the preceding paragraphs as alleged above.

126.     Through the actions described above, the City retaliated against Plaintiff for the filing of an internal sex discrimination complaint, her filing of the EEOC charge, her participation in the EEOC investigation, and the filing and pursuit of this lawsuit, in violation of Title VII.

127.     As a result of the City's unlawful retaliation, Plaintiff suffered injuries including but not limited to damage to her reputation, the loss of her command position and training and promotional opportunities, and severe mental anguish and emotional distress, including physical illness associated with such distress. In addition, the City's unlawful retaliation made Plaintiff's working conditions so intolerable that she had no choice but to retire from the CPD.

**FOURTH CLAIM FOR RELIEF**
**Equal Protection – 42 U.S.C. § 1983 (*Monell*)**
**(Against the City of Chicago)**

128.     Plaintiff incorporates by reference the preceding paragraphs as alleged above.

129.     At all times relevant, the City of Chicago has acted under color of law.

130.     The City's intentional sex discrimination against Plaintiff and other women applying for promotion to and employed in CPD's Special Functions Division has been so widespread and well-settled as to constitute a standard operating

32

procedure of the City, the *de facto* equivalent of a formal policy of sex discrimination with the force of law.

131.    As a direct and proximate result of the City's sex discrimination against Plaintiff, she has suffered injuries including but not limited to damage to her reputation, the loss of her command position and training and promotional opportunities, and severe mental anguish and emotional distress, including physical illness associated with such distress.

### FIFTH CLAIM FOR RELIEF
### Equal Protection – 42 U.S.C. § 1983
### (Against Defendant Georgas)

132.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

133.    At all times relevant, Defendant Georgas acted under color of law.

134.    Defendant Georgas intentionally discriminated against Plaintiff on the basis of her sex in violation of her equal protection rights by creating a hostile work environment and taking adverse action against her, including but not limited to imposing unwarranted discipline, denying training opportunities, opening a spurious Internal Affairs complaint, and terminating her command of the Marine and Helicopter Unit.

135.    As a direct and proximate result of Defendant Georgas' sex discrimination against Plaintiff, she has suffered injuries including but not limited to damage to her reputation, the loss of her command position and training and

promotional opportunities, and severe mental anguish and emotional distress, including physical illness associated with such distress.

## SIXTH CLAIM FOR RELIEF
### Equal Protection – 42 U.S.C. § 1983 – Civil Conspiracy
### (Against Defendants Georgas, Fitzsimmons, Harnish, Romero, and Hadju)

136.     Plaintiff incorporates by reference the preceding paragraphs as alleged above.

137.     At all times relevant, Defendants Georgas, Fitzsimmons, Harnish, Romero, and Hadju acted under color of law.

138.     On June 7, 2016, Defendants met in person and together conspired to have one or more spurious sexual harassment complaints filed against Plaintiff to create a pretext for her removal from command of the Marine and Helicopter Units, because of her sex.

139.     Defendants conspired to engage in intentional discrimination against Plaintiff on the basis of sex, in violation of her equal protection rights.

140.     As a direct and proximate result of Defendants' conspiracy against Plaintiff, she has suffered injuries including but not limited to damage to her reputation, the loss of her command position and training and promotional opportunities, and severe mental anguish and emotional distress, including physical illness associated with such distress.

## SEVENTH CLAIM FOR RELIEF
## Illinois Civil Rights Act, 740 ILCS 23/5
## (Against the City of Chicago)

141.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

142.    Through the actions described above, the City subjected Plaintiff to discrimination on the basis of her sex, in violation of 740 ILCS 23/5.

143.    As a result of the City's violation of the Illinois Civil Rights Act, Plaintiff has suffered damages including but not limited to damage to her reputation, the loss of her command position and training and promotional opportunities, and severe mental anguish and emotional distress, including physical illness associated with such distress.

## EIGHTH CLAIM FOR RELIEF
## Illinois Whistleblower Act, 740 ILCS 174/15
## (Against the City of Chicago)

144.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

145.    Through the actions described above, the City retaliated against Plaintiff for disclosing information to a law enforcement agency, where Plaintiff had reasonable cause to believe that the information disclosed a violation of federal law.

146.    As a direct and proximate result of the City's violation of the Illinois Whistleblower Act, Plaintiff has suffered damages including but not limited to the loss of her command position and promotional opportunities, damage to her

35

reputation, and severe mental anguish and emotional distress, including physical illness associated with such distress.

## NINTH CLAIM FOR RELIEF
### Equal Protection – 42 U.S.C. § 1983
### (Against Defendant Richards)

147.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

148.    At all times relevant, Defendant Richards has acted under color of law.

149.    Defendant Richards intentionally retaliated against Plaintiff for the filing of an internal sex discrimination complaint and this lawsuit, in violation of her equal protection rights.

150.    As a direct and proximate result of Defendant Richards's retaliation against Plaintiff, she has suffered injuries including but not limited to the loss of income; damage to her reputation; and emotional distress. In addition, Defendant Richard's unlawful retaliation made Plaintiff's working conditions so intolerable that she had no choice but to retire from the CPD

## INDEMNIFICATION
### (Against the City of Chicago)

151.    Plaintiff incorporates by reference the preceding paragraphs as alleged above.

152.    Because Georgas, Richards, Fitzsimmons, Hadju, Harnish, and Romero, were acting within the scope of their employment with the City, the City of Chicago is responsible under 745 ILCS 10/9-102 to indemnify them against

compensatory damages, and may also pay associated attorney's fees and costs, for which they are liable to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.      Declare that the City has engaged in a policy, custom, or practice that deprived Plaintiff of rights protected by Title VII, the Fourteenth Amendment, the Illinois Civil Rights Act, and the Illinois Whistleblower Act;

B.      Order the City to adopt and implement policies, procedures, and practices that will curtail discrimination against women in the Special Functions Division;

C.      Appoint a monitor to ensure the City's compliance with Title VII, the Fourteenth Amendment, the Illinois Civil Rights Act, and the Illinois Whistleblower Act in the Special Functions Division;

D.      Award Plaintiff backpay, compensatory damages, and other make-whole legal and equitable relief;

E.      Order Defendants Georgas, Richards, Fitzsimmons, Harnish, Hadju, and Romero to pay punitive damages;

F.      Order the City to indemnify Georgas, Richards, Fitzsimmons, Harnish, Hadju, and Romero for compensatory damages awarded against them;

G.      Award Plaintiff her reasonable attorneys' fees, costs, and expenses, including expert witness fees, as provided for in 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 1988, 740 ILCS 23/5, and 740 ILCS 174/30;

H.     Award Plaintiff pre-judgment and post-judgment interest; and

I.     Order all other appropriate relief as the interests of justice may require.

## JURY DEMAND

Plaintiff demands trial by jury on all claims and issues that may be tried to a jury.

Dated:  July 2, 2019                Respectfully submitted,

/s Cynthia H. Hyndman
Cynthia H. Hyndman
chyndman@robinsoncurley.com
Laura R. Feldman
lfeldman@robinsoncurley.com
Benjamin E. Schwab
bschwab@robinsoncurley.com
Robinson Curley P.C.
300 S. Wacker Drive, Suite 1700
Chicago, IL 60606
(312) 663-3100
(312) 663-0303 (Fax)

Marni Willenson
marni@willensonlaw.com
Willenson Law, LLC
542 S. Dearborn Street, Suite 610
Chicago, IL  60605
(312) 508-5380
(312) 508-5382 (Fax)

*Attorneys for Plaintiff*