IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALLISON SCHLOSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 18-cv-1880 |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | Mag. Judge Maria Valdez |
| CITY OF CHICAGO, et al. | ) | |
| | ) | |
| Defendants, | ) | |

*and*

| | | |
|---|---|---|
| MAUREEN BRESNAHAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 18-cv-1974 |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | Mag. Judge Maria Valdez |
| CITY OF CHICAGO, et al. | ) | |
| | ) | |
| Defendants, | ) | |

*and*

| | | |
|---|---|---|
| MELISSA TAPIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 19-cv-01257 |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | Mag. Judge Maria Valdez |
| CITY OF CHICAGO, et al. | ) | |
| | ) | |
| Defendants, | ) | |

**MOTION TO COMPEL**

Plaintiffs Allison Schloss, Maureen Bresnahan, and Melissa Tapia, by their attorneys, pursuant to Fed. R. Civ. P. 37, move this Court to compel Defendants the City of Chicago and Eduardo Beltran to produce documents and the City to allow inspection of work sites and equipment.[1] In support thereof, Plaintiffs state as follows:

**A.     Damage Information in All Three Cases**

1. On July 20, 2021, Plaintiffs served their Consolidated Third Requests for Production on the City seeking, in Request Nos. 1-6, data necessary to calculate damages. *See* Ex. 1.

2. Defendants refused to provide data, claiming that Plaintiffs' document requests were barred by an order entered in March 2021. Later, Defendants agreed to produce data, but only in response to Requests 4-6, relating to overtime wages paid to comparator employees.[2] Defendants have refused to provide basic workforce data in response to Requests 1-3. *See* Ex. 2.

3. Requests 1-3 are narrowly tailored requests for the same type of data the City produced in *Ernst v. City of Chicago*, Case No. 08 C 4370 (N.D. Ill.) (Pallmeyer, C.J.) and *Livingston v. City of Chicago*, Case No. 16 C 10156 (N.D. Ill.) (Ellis, J.), sex discrimination cases requiring the calculation of damages for women denied jobs as City of Chicago paramedics. The *Ernst* and *Livingston* plaintiffs used Michael LoGiudice, an accounting expert, to testify about damages. *See Ernst v. City of Chicago*, Case No. 08 C 4370, 2018 WL 6725866, 2018 U.S. Dist. LEXIS 215340, ** 30, 51, 55-59, 69-71, 77, 83-85 (N.D. Ill. Dec. 21, 2018) (Chief Judge Pallmeyer crediting Mr. LoGiudice's work and awarding damages based on his

---

[1]     The parties conferred in writing and by phone in an attempt to resolve the discovery disputes that are the subject of this motion. The phone conferences took place on July 2, August 5, August 26, and September 14, 2021. After good faith attempts to resolve their differences, the parties are unable to reach an accord.

[2]     Plaintiffs have not received the data and cannot verify its sufficiency at this time.

assumptions and calculations). Plaintiffs Schloss, Bresnahan, and Tapia have also engaged Mr. LoGiudice as their expert witness on damages, to apply the same principles and methods he used in *Ernst* and *Livingston*. City of Chicago uniformed Fire Department and Police Department personnel are paid under similar compensation systems (involving civil service ranks, base salaries, overtime pay, duty availability pay, and defined contribution pensions). Because he served as plaintiffs' damages expert in *Ernst* and *Livingston*, Mr. LoGiudice has a clear understanding of the data he needs in order to calculate damages for Plaintiffs Schloss, Bresnahan, and Tapia.

4. In addition to hiring the same expert, Plaintiffs further streamlined damages discovery by modeling their requests on a specific Excel file generated by the City's Department of Human Resources ("DHR") and produced in *Livingston*. Plaintiffs identified the file by Bates number, identified the name of the DHR employee who generated the report, and attached an excerpt of the data showing the table structure of the file. *See* Ex. 1 (Request No. 1 and Ex. A). Request No. 1 seeks:

> 1. A master file (e.g. an "employee census") with the following information for each current and retired sworn member of the Chicago Police Department for as far back as the data go:
>
>    a. First and last name
>    b. Employee ID
>    c. Date of birth
>    d. Date of hire
>    e. Date of separation (if any)
>    f. Current or last job title
>    g. Current salary
>    h. Gender
>    i. Race
>
> Produce the data in the format of the file produced with Bates number CFD0000062497 in *Livingston v. City of Chicago*, Case No. 16-cv-10156 (N.D. Ill.). Exhibit A to these Requests shows the correct table structure. The file properties show that the "author" was Thomas Shimkus in the City of Chicago

3

Department of Human Resources. Date of birth should be included as an additional field.

5.  Request No. 2 seeks an Excel report, which can be generated from the same DHR database, with the work histories including promotion dates of CPD employees hired as far back as the data go. *Id.* (Request No. 2). To make things simple, Plaintiffs provided that "[t]he data covered by this Request (No. 2) may be combined with and produced together with the data covered by Request No. 1." In other words, the City can choose to comply with Requests 1 and 2 by producing a single Excel file with both the employee census and work history data.

6.  Plaintiffs (and specifically Mr. LoGiudice) need the employee census and work history data covered by Requests 1 and 2 to calculate damages for Plaintiffs Schloss and Bresnahan. For example, Mr. LoGiudice needs the data to make the correct assumption about when Detective Bresnahan would have been promoted to the Bomb Squad but for the City's discrimination. The comparator employees were not hired on a single date but rather on multiple dates from approximately December 2017 to the present. The comparator employees' promotion dates are in the City's human resources data. As another example, Mr. LoGiudice needs the employee work history data covered by Request 2 to make the correct assumptions about Plaintiff Schloss' claim that, but for the City's sex discrimination and retaliation, she would have been promoted to the rank of commander. That assumption impacts the calculation of her lost pension damages. After reviewing the data, Mr. LoGiudice will likely apply the same methods that Judge Pallmeyer accepted in *Ernst*, which involves identifying the correct cohort of comparator employees. That cohort could be, for example, employees hired in Plaintiff Schloss' police academy class. Or, it could be employees who continued in service for at least 34 years—the length of time Plaintiff would have stayed but for the City's unlawful conduct. Alternatively, it could be employees hired at the same age Plaintiff was hired. In any case, making the correct

4

assumptions and conducting accurate damages calculations requires the production of reliable and complete workforce data, including a master file and employee work history data for all CPD employees, as far back as the data go.

7. Request No. 3 simply ensures that the data covered by Request 2 are complete for all CPD employees who attained the rank of commander before retirement. These data can be generated from the same DHR database, and again, the City can combine the data sought in Request 3 with the data covered by Requests 1 and 2 and produce all of the data in a single Excel file.

8. In summary, Plaintiffs' Requests 1-3 are for clearly delineated human resources data, narrowly tailored to obtain the data that Plaintiffs' damages expert needs in order to conduct accurate damages calculations for the District Court to evaluate in awarding Plaintiffs backpay, lost pension benefits, prejudgment interest, and tax increment awards. The City produced the same data reports in *Ernst* and *Livingston* for Fire Department employees, and the data for Plaintiffs Schloss, Bresnahan, and Tapia reside in the same DHR database. By employing a damages expert who is familiar with the City's compensation systems and human resources databases, Plaintiffs were able to issue targeted discovery for nothing more and nothing less than the relevant information.

9. Defendants' litany of objections to Requests 1-3 have no merit. First, the Court's March 4, 2021 Order (*Schloss*, Dkt. 193) does not bar Plaintiffs from serving discovery requests related to damages. In their Position Statement on Discovery Deadlines, Defendants sought an order bifurcating *Monell* discovery and staying Plaintiffs' *Monell* claims, expressing concern that Plaintiffs might seek to add *Monell*-related custodians or search terms to ESI searches. *See Schloss*, Dkt. 191 at 4. The Court declined to bifurcate *Monell* discovery, stating that

5

"Defendants' fear that Plaintiffs will issue new *Monell* discovery requests is misplaced. An extension of the discovery deadline would be for the sole purpose of completing document production and oral discovery, not for propounding new requests." Dkt. 192 at 6. Taken in context, the Court's reference was clearly limited to *Monell* discovery, especially because the Court's order extending discovery did not bar the parties from further written discovery. See Dkt. 193 ("The deadline for all fact discovery is extended to August 19, 2021.").[3]

10. Second, Defendants' objection that Request No. 1 violates this Court's Order of July 28, 2020 is misplaced. The Court previously declined to require the City to include race data in monthly or quarterly demographic reports, finding that Plaintiffs had not at that time demonstrated its relevance. *Schloss*, Dkt. 152 at 10. Plaintiffs' Request No 1 does not "violate" the Court order. As Plaintiffs explained to the City at a Rule 37 conference, Request 1 includes race as a field because the model Excel file produced by the City in *Livingston* includes race. Plaintiffs do not need the City to produce race information, and the City is free to exclude that field when it queries its DHR database and generates the master census file. However, if querying the database to exclude race information creates some additional burden, the City cannot complain about it.[4]

---

[3] Defendants raised this argument in the parties' latest Joint Status Report. *See Schloss*, Dkt. 219 at 3. The Court thereafter extended the fact discovery deadline once again, with no restrictions on the type of discovery that could be propounded. *See Schloss*, Dkt. 220.

[4] Further, Plaintiffs have made clear that they will not accept PDFs with race information blacked out instead of data. The Court's previous order was limited to allowing the City to exclude race information from data reports. It did not permit the City to redact race information from responsive documents that happened to contain it—yet that is what the City has proceeded to do, on numerous documents produced in discovery. Under the Court's ESI Order (Dkt. 174), the City must produce information pulled from its databases in a data format such as Excel, and Plaintiffs' damages expert must have data, not PDFs, to calculate damages.

6

11. The City's other objections to Requests 1-3 are a kitchen sink of boilerplate nonsense. *See, e.g., Belcastro v. United Airlines, Inc.*, No. 17 C 1682, 2019 U.S. Dist. LEXIS 65847 (N.D. Ill. April 17, 2019), *objections overruled*, (N.D. Ill. Mar. 15, 2020) (party that objects to discovery cannot bear its burden of showing that a request is improper "by a reflexive invocation of the same baseless, often abused litany, that the requested discovery is vague, ambiguous, overly broad, [or] unduly burdensome" (internal quotation marks omitted)).

12. Defendants' disproportionality objection is particularly unfounded given the section of the Court's ESI Order (an Agreed Discovery Plan) regulating the production of enterprise level structured data: "Are there structured data stores that contain relevant data or information? Yes, human resources, TALEO, and CLEAR databases, for example, will be searched as needed to respond to specific discovery requests." *Schloss*, Dkt. 174 at 8.

13. Running a query on a human resources database and producing a report that includes data from the complete data set is not burdensome. To calculate damages for Plaintiff Schloss, Mr. LoGiudice will evaluate the career trajectories of a comparator cohort. To do this, he *does* need information from several decades back. Plaintiff began her career in 1990 and a comparator cohort could include employees who were hired a number of years before her. The model data produced in *Livingston* (CFD000062497) includes information for employees hired as far back as 1974. Moreover, querying the data as far back as they go adds nothing to the burden of production—a burden that is not, in any case, disproportionate to the needs of these cases, which have combined economic losses in the hundreds of thousands of dollars.

14. Similarly, Defendants' objection that the requests seek "private employee information," is unfounded. Most of the information requested is not in fact private. These are public employees and their names, job titles, hire dates, and salaries are published by the City in

online databases. Moreover, the Court's Protective Order (*Schloss*, Dkt. 199) will prevent disclosure of confidential information.

**B.    Requests for Inspection in *Schloss* and *Tapia***

15.    On May 27, 2021, Tapia and Schloss both served Requests for Inspection on the City. *See* Exs. 3 and 4 hereto.

16.    The City has refused to allow the inspections requested in both cases on the grounds that the requests pose unspecified "significant safety, security, and operational concerns" for the City and the inspections are not relevant. *Id.*

17.    A request to inspect under Rule 34 "'poses a very low hurdle'" and, as long as the request seeks information that is relevant under Rule 26, it should be allowed. *See Eirhart v. Libbey-Owens Ford Co.*, 93 F.R.D. 370, 371 (N.D. Ill. 1981).

18.    Tapia has requested that she be allowed to inspect the Viking dry suits, size 2 wide, that were issued to her during her training for a position as a Marine Officer in the CPD's Marine Unit. Ex. 3, Request No. 2.[5] She has also requested that she be allowed to inspect the boats used by the Marine Unit from which she performed training dives while training for a position as a Marine Officer. *Id.*, Request No. 3. Schloss has requested that she be allowed to inspect the Marine Unit headquarters and the Helicopter Unit headquarters. Ex. 4.

19.    The City's relevance objections are not well-taken. As alleged in Tapia's First Amended Complaint, the dry suits the City issued Plaintiff did not fit her. *See Tapia*, Dkt. 30 at ¶¶ 49-50. It is relevant and would be beneficial for the jury to see and understand just how large these dry suits were. Similarly, Tapia has alleged that the City used as an excuse for terminating her detail to the Marine Unit that Tapia could not get out of the water onto the boats used for

---

[5]    Tapia understands that Near North High School has been demolished and, thus, is not seeking to compel the inspection of the training sites formerly located there, as requested in Request No. 1.

training dives. *See Id.* at ¶ 75. That statement is not true. The City also contends that the "pool exit test" that Tapia was required to perform repeatedly was related to the work she would be doing as a Marine Officer, especially with respect to being able to get out of the water onto the boats. *Id.* at ¶ 37. Plaintiff is entitled to show the jury the back of the boats used by the Marine Unit to support her argument that the "pool exit test" is not reasonably related to the job of a Marine Officer or the ability to get in and out of boats after dives.

20. Plaintiff Schloss's requests to inspect the Marine and Helicopter Unit headquarters are also relevant to her allegations. Schloss alleged that Defendants Fitzsimmons, Hajdu, Harnisch, and Romero made spurious allegations of sexual harassment against her as a pretext to have her removed from her position as Commanding Officer of the Marine and Helicopter Unit. *See Schloss*, Dkt. 95 at ¶¶ 12, 70, 72, 78, 138. At their depositions, Hajdu, Harnisch, and Romero testified that Schloss inappropriately touched them while they were working in either the Marine or Helicopter Unit headquarters. *See* Ex. 5, Harnisch Dep. Tr. at 121:21-126:3 (testimony that Schloss touched him at Helicopter Unit headquarters); Ex. 6, Hajdu Dep. Tr. at 175:6-178:19 (testimony that Schloss touched him in roll call room of Marine Unit headquarters); Ex. 7, Romero Dep. Tr. at 72:2-74:24 (testimony that Schloss touched him in sergeant's office at Marine Unit headquarters). Harnisch testified that on one of the occasions when Schloss touched him, she was standing behind his desk at the Helicopter Unit headquarters in a very small space. Ex. 5 at 124:17-125:5. The City's counsel elicited testimony from Romero about whether, in his opinion, the sergeant's office at the Marine Unit headquarters was large enough that two people could be in it without touching. Ex. 7 at 96:14-97:3. Schloss is entitled to inspect these locations and take measurements and photographs of the locations where defendants allege she inappropriately touched them to address these allegations.

21. Furthermore, the City's alleged concerns regarding safety, security, and operations are vague and unsupported. Plaintiff is willing to work with the City to organize and schedule the inspections to cause the least amount of disruption. Moreover, it is not unusual for non-CPD personnel to visit the Marine Unit headquarters where the dry suits and boats are kept. Many CPD officers, including Steve Georgas, the former Deputy Chief of the Special Functions Division in which the Marine Unit was housed, testified that the Marine Unit routinely takes citizens, including the families of Marine Officers, out for boat rides. The only caveat was that these boat rides couldn't occur during peak times. In fact, citizens were advised that if they were on a boat ride and the unit got a call, they might be out on the boat for the entire time it took the officers to do their job. *See* Ex. 8, Georgas Dep. Tr. at 93:18-95:15. If safety and security concerns don't keep ordinary citizens off of police boats when the police are responding to a call, they should not keep plaintiffs from being able to gather evidence to prove their claims.

**C.    Defendant Beltran's Investigative File**

22. On May 27, 2021, Plaintiff Tapia served her Third Request for Production of Documents seeking documents and ESI relating to Police Board Case 21 PB 2992 in which charges were brought against Defendant Sergeant Eduardo Beltran and Officer Michael Michalik. Ex. 9. Specifically, Tapia is seeking the production of the closed investigation file that led to the charges levelled against Beltran and Michalik. Both the City and Defendant Beltran have objected to producing these documents. *See* Ex. 10 and 11.

23. Both parties object to the production of documents on the grounds of relevance. The parties are wrong. The charges against Beltran are that he took a bribe to use CPD equipment and resources to recover a lost boat propeller for a private citizen and then made a false report relating to the recovery effort. *See* Ex. 9. Tapia alleges that, in connection with the

termination of Tapia's detail to the Marine Unit, Beltran made false statements to his superior, Defendant Paul Mack. Tapia also contends that Beltran made false entries in the training logbook about Tapia. Thus, if Beltran is found to have made a false report leading to his discharge, the facts surrounding that false report are probative both of his credibility and his cavalier attitude towards accurate reporting, issues of significant relevance to Tapia's claims.

24. The City further objects to the production of the closed investigation file on the grounds of the law enforcement investigative privilege and on the grounds that the documents are private because they involve an ongoing Police Board proceeding. Ex. 10.

25. The City has, once again, failed to support its assertion of the law enforcement investigative privilege. This Court has made clear that the City must properly assert the privilege, consistent with case law, which requires production of an affidavit of a CPD official who has personally considered the documents and that specifies the information for which protection is sought and why that information falls within the scope of the privilege. *See Schloss*, Dkt. 152 at 13-15. The City has failed to do so and, therefore, must produce the investigation file.

26. The City's contention that Police Board proceedings are private is simply false. All Police Board proceedings are open to the public. *See* https://www.chicago.gov/city/en/depts/cpb/provdrs/police_discipline/html.

27. Beltran has objected to production of the closed investigation file on the grounds that it is not in his possession, custody, or control because he doesn't personally have a copy of the file, only his attorneys do. Beltran further takes the position that the attorneys who have filed appearances on his behalf in the Police Board proceeding do not represent him, they represent the union, citing *Zander v. Carlson*, 2019 IL App (1st) 181868. Thus, according to Beltran, the

11

documents relating to the Police Board hearing are in the possession of the union's attorneys and he does not have the legal right to obtain them. Ex. 11.

28. *Zander* is inapposite. The police officer in *Zander* was involved in an arbitration proceeding pursuant to the collective bargaining agreement, not a Police Board hearing. *Id.* at ¶ 1. His union selected an attorney to represent him in the arbitration and, under those circumstances, the Court found that the attorneys represented the union and not the police officer. *Id.* at ¶ 17. Those are not the circumstances here; Beltran's attorney represents him, not the union.

29. Beltran is facing discharge from the CPD and his case is pending before the Police Board. The Police Board's Rules of Procedure provide that the Respondent in a Police Board proceeding, "shall appear in person or through an attorney of the Respondent's own choosing." Police Board Rules of Procedure, Ex. 12 at I(I). Beltran has chosen attorney Donna Dowd to represent him before the Police Board. Ms. Dowd has her own private practice at Dowd Law, LLC and is also a member of the Illinois Police Benevolent & Protective Association's (IPBPA) Labor Committee. The website for the IPBPA explains that its Labor Committee provides a Legal Defense Plan through which members receive certain benefits, including representation at discipline and discharge proceedings before the Police Board. The website further explains, "Any member who uses this benefit becomes the client of the individual attorney retained for representation." *See* https://pbpa.org.gw1dev3.com/About/PBLC.aspx. Thus, Beltran's contention that Ms. Dowd represents the union, and not him, is simply false.

30. Beltran has the legal right to obtain documents from his attorney. *See Boyd Group (U.S.), Inc. v. D'Orazio*, No. 14-cv-7751, 2015 U.S. Dist. LEXIS 121117 (N.D. Ill. Sept. 11, 2015) (party had legal right to obtain documents from his *former* attorney). Because he has the

12

legal right to obtain the documents from Ms. Dowd, he must turn them over in response to Tapia's proper Rule 34 document request. *Id.*

WHEREFORE, plaintiffs Allison Schloss, Maureen Bresnahan, and Melissa Tapia respectfully request that this Court grant their Motion to Compel and order the production of documents responsive to Request Nos. 1-3 of their Third Consolidated Request for Production, order the City to provide access to equipment and work sites as identified in Schloss's and Tapia's Requests for Inspection, and order the City and Defendant Beltran to produce the investigative file requested in Tapia's Third Request for Production of Documents, award plaintiffs their fees and costs for pursuing this motion, and grant such other and further relief as may be just and proper.

Dated:  September 16, 2021			Respectfully submitted,

					**ALLISON SCHLOSS**
					**MAUREEN BRESNAHAN**
					**MELISSA TAPIA**


					By:  /s/ Cynthia H. Hyndman
						One of their attorneys


Cynthia Hyndman
C. Philip Curley
ROBINSON CURLEY P.C.
300 South Wacker Drive, Suite 1700
Chicago, IL  60606
(312) 663-3100
chyndman@robinsoncurley.com
pcurley@robinsoncurley.com

13

Marni Willenson
Hamza Jaka
W<small>ILLENSON</small> L<small>AW</small>, LLC
3420 West Armitage, Suite 200
Chicago, IL 60647
312-508-5380
marni@willensonlaw.com
hjaka@willensonlaw.com